UNITED NATIONAL INSURANCE COMPANY, Plaintiff,

v.

MUNDELL TERMINAL SERVICES, INC.; and BAL Metals International Incorporated, Defendants,

and

Keith D. Peterson & Company, Inc.; and Scarbrough Medlin & Associates, Inc., Intervenor–Defendants.

No. EP–11–CV–00536–DCG.

United States District Court,
W.D. Texas,
El Paso Division.

Dec. 21, 2012.

Alissa Puckett, Gregory K. Winslett, Quilling, Selander, Lownds, Winslett & Moser, PC, Dallas, TX, Antonio Martinez, Jr., Firth Johnston Martinez, El Paso, TX, for Plaintiff.

Darryl Scott Vereen, Norman J. Gordon, Mounce, Green, Myers, Safi & Galatzan, Francisco Javier Ortega, Scott Hulse, PC, El Paso, TX, Jordan F. Kaplan, Royston, Rayzor, Vickery & Williams, LLP, Houston, TX, for Defendants.

Jeffrey T. Lucky, Ray, Valdez, McChristian & Jeans, El Paso, TX, Leland C. De La Garza, Brian Patrick Shaw, Jr., Shackelford, Melton & McKinley LLP, Dallas, TX, for Intervenor–Defendants.

## MEMORANDUM OPINION AND ORDER

DAVID C. GUADERRAMA, District Judge.

Before the Court for consideration is Plaintiff United National Insurance Company's ("UNIC") Motion for Summary Judgment (ECF No. 28) filed in the above-captioned action. Invoking this Court's jurisdiction under 28 U.S.C. § 1332(a)(1), diversity of citizenship, Plaintiff brought this declaratory judgment action pursuant to 28 U.S.C. § 2201, seeking declaration of no duty to defend or indemnify, and no coverage under an insurance policy issued by it. In the instant motion, Plaintiff seeks summary judgment on its claims for declaratory relief. Having carefully considered the motion, the parties' briefs, the language of the policy, and the applicable law, the Court is of the view that Plaintiff's motion should be GRANTED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Facts

The following facts are undisputed.[1]

Defendant Mundell Terminal Services, Inc. ("MTS") operates a warehouse business in El Paso, Texas. In 2008, BAL Metals International Incorporated ("BMI") entered into a contract with MTS for warehousing services. Pursuant to that contract, BMI stored its copper sheeting at one of MTS's warehouse facilities located on Railroad Drive in El Paso, Texas. On or about November 25, 2010, and December 4, 2010, BMI's copper, valued at $483,389.20, was stolen from the warehouse. At the time of the thefts, two insurance policies were in effect: a first-party property insurance policy (policy number KMP0000170), which is the subject of this declaratory action, issued to MTS by UNIC, and a marine cargo insurance policy, with a policy limit of $25 million, issued to BMI by Aon Risk Solutions ("Aon"). The UNIC policy contains a commercial property coverage part and a commercial inland marine coverage part. Subject to numerous exclusions, conditions, and limitations, the commercial property coverage part covers direct physical loss of "Stock, including Property of Others while in the insured's care, custody and control," with a policy limit of $500,000. At the time of the theft, BMI's copper was in MTS's care, custody, and control.

MTS made timely claims for the copper thefts, and UNIC sent a "reservation of rights" letter to MTS on December 31, 2010. The participating underwriters of the Aon policy reimbursed BMI $483,389.00 for its loss from the thefts.

BMI signed a subrogation agreement, in which the underwriters were subrogated to all of its rights and remedies then existing in its favor respecting the stolen copper. On February 24, 2011, Aon, as the subrogee of BMI, sued MTS in a lawsuit styled *BAL Metals International, Incorporated v. Mundell Terminal Services, Inc.,* under Cause No. 2011–663 in the 41st Judicial District Court of El Paso County, Texas (the "BMI suit"). In that suit, BMI asserted causes of action for breach of contract, negligent misrepresentation, negligence, negligence per se, and breach of warranty of services. On March 2, 2011, MTS tendered the BMI lawsuit to UNIC, and on March 14, UNIC sent a letter to MTS, declining to provide a defense or indemnity to MTS in that suit.

On March 6, 2012, MTS filed a lawsuit (the "MTS suit") in the County Court at Law number 7 in El Paso, Texas, against UNIC, Keith D. Peterson & Company, Inc. ("KDP"), an underwriter for UNIC who issued the UNIC policy to MTS, and Scarbrough, Medlin, & Associates, Inc. ("SMA"), an insurance broker who requested coverage for MTS. In that suit, MTS alleged causes of action for negligence, fraud, and violations of the Texas Deceptive Trade Practices Act and the Texas Insurance Code.

### B. Procedural Background

On December 15, 2011, UNIC brought this declaratory judgment action. In its Original Complaint for Declaratory Judgment (ECF No. 1), UNIC seeks a declaration that it has no obligation to defend or indemnify MTS against the claims asserted in the BMI suit and a further declaration that its policy provides no coverage

---

1. The facts are drawn from the pleadings, affidavits and exhibits, and the parties' submission, pursuant to this Court's Standing Order Regarding Motions for Summary Judgment, of documents setting forth proposed undisputed facts by the movant and response thereto by the nonmovants.

for the thefts of the copper. As originally filed, the lawsuit named only MTS and BMI as defendants.

On June 6, 2012, UNIC filed the instant motion, seeking summary judgment on its declaratory judgment claims asserted in its complaint. Pl. UNIC's Mot. for Summ. J. [hereinafter Pl.'s Mot. for Summ. J.], ECF No. 28. MTS and BMI filed responses on July 5, and UNIC followed by filing a reply. Def. MTS's Resp. & Br. in Opp'n to Pl.'s Mot. for Summ. J. [hereinafter MTS's Resp.], ECF No. 29; Def. BMI's Resp. & Br. in Opp'n to Pl.'s Mot. for Summ. J. [hereinafter BMI's Resp.], ECF No. 31; Pl. UNIC's Reply in Supp. of Its Mot. for Summ. J. [herein after Pl.'s Reply to BMI & MTS], ECF No. 37. KDP filed a motion to intervene in this action on July 6, and SMA on August 8. The Court granted their motions, which were not opposed. Thereafter, KDP filed an amicus brief and SMA a responsive brief in response to UNIC's summary judgment motion, and UNIC filed its replies. Amicus Curiae Br. of KDP [hereinafter KDP's Br.], ECF No. 40; SMA's Resp. to Pl.'s Mot. for Summ. J. & Br. in Support [hereinafter SMA's Resp.], ECF No. 58.

Having examined multiple briefs filed by the parties, the Court, on November 29, 2012, issued an order directing the parties to file a supplemental brief to clarify their arguments made in their briefs. Thereafter, on December 3, UNIC filed its supplemental brief, and on December 6, MTS, BMI, KDP, and SMA (hereinafter collectively "Defendants") jointly filed a response to UNIC's supplemental brief. PL UNIC's Supplemental Br. in Supp. of Its Mot. for Summ. J. [hereinafter Pl.'s Supplemental Br.], ECF No. 91; Joint Br. in Resp. to UNIC's Supplemental Br. in Supp. of Its Mot. for Summ. J. [hereinafter Defs.' Supplemental Br.], ECF No. 95.

## II. APPLICABLE LAW

### A. Summary Judgment Standard

Summary judgment is appropriate if the record discloses that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir.2009) (quoting *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir.2000) (*per curiam*)). "A factual dispute is 'genuine' if a reasonable trier of fact could return a verdict for the nonmoving party." *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir.2008). In assessing whether a genuine dispute as to material fact exists, a trial court reviews the evidence from the summary judgment record, drawing all justifiable inferences in the light most favorable to the nonmovant, *Man Roland, Inc. v. Kreitz Motor Express, Inc.*, 438 F.3d 476, 478–79 (5th Cir.2006) (citation omitted), but refrains from making "credibility determinations or weighing the evidence," *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir.2009) (citation omitted). Thus, the ultimate inquiry in a summary judgment motion is " 'whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law.' " *Septimus v. Univ. of Hous.*, 399 F.3d 601, 609 (5th Cir.2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

"Procedurally, the party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion, and identifying those portions of the record which it believes

demonstrate the absence of a genuine issue of material fact." [2] *Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir.2001) (internal quotation marks and brackets omitted). " 'If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response.' " *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir.2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*per curiam* )). If, on the other hand, the moving party satisfies its burden, the nonmovant must, by submitting or referring to evidence, set out "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Sufficient support for the assertion that there is or is not a genuine dispute as to a material fact may be adduced from depositions, documents, affidavits or declarations, stipulations, admissions, interrogatory answers, and other materials in the record. Fed.R.Civ.P. 56(c). However, conclusory statements, improbable inferences, unsupported speculation, and unsubstantiated assertions are insufficient to either support or defeat a motion for summary judgment. *Brown v. City of Hous.*, 337 F.3d 539, 541 (5th Cir.2003); *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir.2010); *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir.1985).

**B. Law Governing Interpretation of Insurance Contract**

 Because this is an action based on diversity of citizenship, the Court will apply the substantive law of the forum state, to wit Texas law.[3] *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Admiral Ins. Co. v. Ford*, 607 F.3d 420, 422 (5th Cir.2010) (applying Texas rules of contract interpretation to interpret Texas contract). "Under Texas law, the same rules apply to the interpretation of insurance contracts as apply to the interpretation of other contracts." *Am. Nat'l Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir.2001) (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex.1994)). When interpreting an insurance contract, the court's primary objective is to effectuate the intent of the parties as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *R & P Enter. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980). The court considers "the policy as a whole to ascertain the true intent of the parties," *Utica Nat'l Ins. Co. v. Am. Indem. Co.*, 141 S.W.3d 198, 202 (Tex.2004), and seeks "to harmonize and give effect to all provisions so that none will be meaningless," *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex.2010). Terms used in the policy are given "their ordinary and commonly understood meaning unless the policy itself shows the parties intended a different, technical meaning." *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex.2008). The court must "strive to honor the parties' agreement and not remake their contract by reading additional provisions into it." *Gilbert Tex. Constr., L.P.*, 327 S.W.3d at 126.

 "Whether a contract is ambiguous is a question of law." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996). If the contract as written can be given a

---

**2.** The Court, here, uses the terms "dispute" and "issue" interchangeably. *See* Advisory Committee's Notes on 2010 Amendment on Fed.R.Civ.P. 56 (stating that in the amended rule, "genuine 'issue' becomes genuine 'dispute.' Dispute better reflects the focus of a summary-judgment determination").

**3.** As evidenced by the parties' briefs in connection with UNIC's motion, the parties agree that the substantive law of Texas applies here.

certain or definite meaning, it is not ambiguous and therefore is construed as a matter of law. *Chrysler Ins. Co. v. Greenspoint Dodge of Hous., Inc.,* 297 S.W.3d 248, 252 (Tex.2009). If, on the other hand, a contract is ambiguous, such ambiguity will be strictly construed against the insurer. *Gonzalez v. Mission Am. Ins. Co.,* 795 S.W.2d 734, 737 (Tex. 1990). However, a court will find a term ambiguous "[o]nly when, after applying the applicable rules of construction, a contract term is susceptible of two or more reasonable interpretations." *Kelley–Coppedge, Inc. v. Highlands Ins. Co.,* 980 S.W.2d 462, 465 (Tex.1998). "[A]n ambiguity does not arise simply because the parties advance conflicting interpretations of the contract." *Grain Dealers Mut. Ins. Co. v. McKee,* 943 S.W.2d 455, 458 (Tex.1997). Moreover, the court will not strain to find ambiguities where none exists, especially if doing so would defeat the probable intentions of the parties. *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.,* 174 F.3d 653, 657 (5th Cir.1999).

## III. DISCUSSION

As mentioned, in this motion, UNIC seeks summary judgment on its declaratory judgment claims asserted in its complaint. It claims that it has no obligation to defend or indemnify MTS against the claims raised in the BMI suit and further that its policy provides no coverage for the thefts of the copper. The Court will address these claims in turn.

### A. UNIC's Claim That It Has No Duty to Defend or Duty to Indemnify MTS in the BMI Suit

 UNIC contends that it has no duty to defend or indemnify MTS in the BMI suit. In support, it points out that its policy is a first-party property policy and does not provide liability coverage of any kind. Pl.'s Mot. for Summ. J. 2. One Texas court has described the distinction between property insurance and liability insurance as follows:

> We understand the distinction between property insurance and liability insurance. Many policies involve both. A policy of property insurance is a personal contract for indemnity for the insurable interest possessed by the insured at the time of the issuance of the policy, and also at the time of the loss. Property insurance policies are intended solely to indemnify the insured for his actual monetary loss by the occurrence of the disaster; unless the insured has sustained an actual loss, the insurer has no liability. Liability policies, on the other hand, insure against loss arising out of legal liability, usually based upon the assured's negligence.

*Highlands Ins. Co. v. City of Galveston,* 721 S.W.2d 469, 471 (Tex.App.-Houston [14th] 1986, writ ref'd n.r.e.) (internal quotation marks and citation omitted). Other courts have also so recognized. *E.g., Tellepsen Builders, L.P. v. Kendall/Heaton Assocs. Inc.,* 325 S.W.3d 692, 697 (Tex. App.-Houston [1st] 2010, pet. denied) (listing Texas cases that have recognized the distinction). "In liability insurance policies generally, an insurer assumes both the duty to indemnify the insured, that is, to pay all covered claims and judgments against insured, and the duty to defend any lawsuit brought against insured that alleges and seeks damages for an event potentially covered by the policy, even if groundless, false or fraudulent." Lee R. Russ & Thomas F. Segalia, 14 Couch on Insurance 3d § 200:3 (2009) [hereinafter "Couch on Insurance"]. The two "duties are independent, and the existence of one does not necessarily depend on the existence or proof of the other." *D.R. Horton–Tex., Ltd. v. Markel Int'l Ins. Co.,* 300 S.W.3d 740, 745 (Tex.2009).

 Under Texas law, an insurer's duty to defend is determined by applica-

tion of the "eight corners" rule. *Nat'l Union Fire Ins. Co. of Pittsburgh v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex.1997) (*per curiam*). "This rule requires the finder of fact to compare only the allegations in the underlying suit—the suit against the insured—with the provisions of the insurance policy to determine if the allegations fit within the policy coverage." *Standard Waste Sys. Ltd. v. Mid–Continent Cas. Co.*, 612 F.3d 394, 399 (5th Cir.2010) (quotation marks omitted). The determination of whether a duty to indemnify exists "hinges on the facts established [in the underlying suit] and the terms and conditions of the ... policy." *D.R. Horton–Tex., Ltd.*, 300 S.W.3d at 743. Thus, the determination of whether the insurer has a duty to defend or a duty to indemnify presumes that there is a provision locatable in the policy that obligates the insurer to undertake such a duty. UNIC contends that its property insurance policy does not contain any terms requiring it to defend or indemnify its insured for third-party liability claims of any kind.

■ In response to UNIC's motion for summary judgment, MTS concedes that the UNIC policy provides first party coverage only and does not provide general liability coverage of any kind.[4] MTS's Resp., Ex. 2 (MTS's Resp. to Proposed Undisputed Facts), at 1 ("A.2 Admit"). Moreover, MTS responds that "this"[5] is not a duty to defend case "in the traditional sense," and that it is not looking for duty to defend under the policy. MTS's Resp. 7. It explains that under the UNIC policy, UNIC had a duty to pay for the loss of the property, and that its failure to pay brought about the BMI suit in the state court. *Id.* Further, MTS faults UNIC for referring "to the eight corners rule usually applied to construe whether a law suit triggers the duty to defend, duty to indemnify provisions of liability policies. This case is a first party case." *Id.*

The Court therefore finds that MTS does not dispute that the UNIC policy does not provide for any duty to defend or duty to indemnify MTS in a lawsuit, as those duties are understood in the context of liability policies. Accordingly, the Court holds that there is no genuine dispute as to the fact that the UNIC policy does not impose upon UNIC any duty to defend or indemnify MTS in the BMI suit—as those duties are understood in the context of liability insurance.[6] Therefore, UNIC is

---

4. Moreover, the Court notes that the UNIC policy obligates UNIC to "pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." Pl. UNIC's Supplemental App. in Supp. of Mot. for Summ. J., Ex. A–1 [hereinafter *UNIC Policy*], at APP 0006. Where a policy provision covers property contained in specified places, such provision is held to indemnify the insured against loss of the property, but not against his legal responsibility in tort or by contract. *Hudiburg Chevrolet, Inc. v. Globe Indem. Co.*, 394 S.W.2d 792, 796–97 (Tex.1965).

5. Specifically, MTS states:

> *This* is not a duty to defend *case* in the traditional sense. MTS is looking to UNIC

*in this case* not because it had a duty to defend under the policy, but because as first party coverage UNIC had a duty, as recommended by its adjuster in December 2010, to pay for the loss of the property that was insured under the policy.

MTS's Resp. 7. It is unclear whether by the word "this case," MTS refers to this action or the BMI suit. Because in its pleading filed in response to UNIC's declaratory judgment complaint, MTS has not asserted any claim, let alone a claim seeking reimbursement for the loss, the Court presumes that MTS refers to the BMI suit in the state court.

6. Typically, the Court would withhold ruling on an insurer's duty to indemnify until after the facts are proven in the underlying lawsuit to establish the insured's liability. *Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d

entitled to judgment as a matter of law on this claim.

## B. UNIC's Claim That Its Policy Provides No Coverage for the Thefts of the Copper

By the way of providing a background, the Court notes that along with its summary judgment motion, UNIC has introduced a copy of the commercial property coverage part of its policy. Pl. UNIC's Supplemental App. in Supp. of Mot. for Summ. J., Ex. A–1 [hereinafter *UNIC Policy*], ECF No. 69. That part of the policy contains primarily standardized forms: among them are a "Building and Personal Property Coverage Form" and a "Commercial Property Conditions" form. For example, the "Building and Personal Property Coverage Form" is an exact copy of the standard insurance form "CP 00 10 06 07." [7] Also contained in the policy are two declaration pages: one entitled "Commercial Property Coverage Part Declarations," and the other "Commercial Property Coverage Part Supplemental Declarations" (From SPA–113). These declaration pages, which are customized, contain coverage information specific to MTS, and they are, in turn, referenced in various provisions in the "Building and Personal Property Coverage Form."

With that exposition of background, the Court turns to UNIC's specific claims. UNIC contends that as a matter of law the thefts of the copper are not covered under its policy. To that end, UNIC advances two claims in the alternative. First, it claims that provision A.2.k (hereinafter the "Exclusion (k)" provision) of the "Building and Personal Property Coverage Form" precludes the copper from being a covered property under the UNIC policy, and therefore the thefts of the copper are not covered under its policy. Pl. Mot. Summ. J. 2, 4. Second, stating that in the unlikely event that the Court concludes that the Exclusion (k) provision does not preclude coverage, it claims that provision G.2 of the "Commercial Property Conditions" form operates to make its policy excess to the Aon policy. *Id.* at 2, 6. Thus, UNIC continues, because the Aon policy, which has a $25 million policy limit, easily covers the loss of the stolen copper, which was valued at $483,389.20, there is no excess amount due from the Aon policy. *Id.* 2, 6. Consequently, UNIC contends, neither MTS nor BMI is entitled to reimbursement under the UNIC policy.

 The Court begins with UNIC's first claim—whether the Exclusion (k) provision precludes coverage of the thefts from its policy. The "Building and Personal Property Coverage Form" in the UNIC policy states in pertinent part:

### A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

#### 1. Covered Property

*Covered Property, as used in this Coverage Part, means the type of property described in this section, A.1., and limited in A.2., Property Not Covered, if a Limit of Insurance is*

248, 253 (5th Cir.2011) (citing *D.R. Horton– Tex., Ltd. v. Markel Int'l Ins. Co.,* 300 S.W.3d 740, 744 (Tex.2009)). However, here the determination of whether UNIC has a duty to indemnify turns on, in the first place, whether its policy contains any provision imposing upon UNIC a duty to indemnify its insured for

liability of *any kind*—irrespective of any facts proven to establish a particular liability of the insured in the underlying suit.

7. At the bottom of the pages, following notation appears: "CP 00 10 06 07 © ISO Properties, Inc., 2007."

shown in the Declarations for that type of property.

**a. Building,. . . .**

. . .

**b. Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property— Separation Of Coverage form:

. . .

(3) "Stock";

**c. Personal Property Of Others** that is:

(1) In your care, custody or control; and

(2) Located in or on the building described in the Declarations or in the open (or in a vehicle) within 100[0] feet of the described premises.

However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**2. Property Not Covered**

Covered Property does not include:

. . .

k. *Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance* [.]

*UNIC Policy,* at APP 0007–08 (emphasis added); *see also id.* at APP 0034 ("The Personal Property of Others in the open distance limit is increased to 1,000 feet."). UNIC argues that the Exclusion (k) provision—i.e., provision A.2.k—operates to preclude the stolen copper from the scope of provision A.1, which defines "Covered Property"—property that is covered under its policy.

As an initial matter, the Court notes that although UNIC directly jumps to the Exclusion (k) provision to support it claim, it is imperative to inquire under which category of property, as described in provision A.1, the stolen copper falls in the first instance. This is so because some of the provisions in the policy, which may be helpful in interpreting the Exclusion (k) provision, *see Forbau,* 876 S.W.2d at 133 ("The contract must be considered as a whole. Moreover, each part of the contract should be given effect." (citation omitted)), are applicable only to a specific category of property described in provision A.1. As will be seen, UNIC in its brief relies on one such provision to support its argument, but fails to address whether that provision applies to the copper in the first place. Accordingly, the Court will make that inquiry first.

The supplemental declaration page, which contains the schedule of locations and statement of values, lists one of MTS's three warehouses located at 9650 Railroad, El Paso, Texas, and further states: "Stock, *including* Property of Others while in the insured's care, custody and control," along with a notation for value in the amount of $500,000. *UNIC Policy,* at APP 0006 (italics added). The parties' filings indicate that "Property of Others" is not defined in the policy. However, as the word "including" reflects, "Property of Others" is a sub-category of property called "stock." The Commercial Property Coverage Part Declarations, in turn, contains the following notation: "PERSONAL PROPERTY *INCLUDING* 'STOCK.'" *Id.* at APP 0005 (italics added). Here again, the word "including" suggests that "stock," in turn, is a sub-category of personal property. Thus, read together, the two declaration pages suggest that the term "Property of

Others" as used in the supplemental declaration form is indeed—the *personal property of others* that is stock. Moreover, "stock" is defined elsewhere in the "Building and Personal Property Coverage Form" as "merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping." *Id.* at APP 0021. As the stolen copper fits within the broad definition of "stock," it is a personal property of others (BMI's). Further, it was in the care, custody, and control of MTS at the time of the thefts. Thus, the copper certainly conforms to the description of property as written in the declaration pages. What remains to be seen is whether the copper, which is a personal property of others, is covered under the policy. For that, we turn to the language of provision A.1, *supra*, which provides that for a property to constitute a covered property, (1) the type of the property must be described in provision A.1, (2) subject to any limitation under provision A.2, and (3) a limit of insurance for that type of the property must be shown on the declaration pages. *UNIC Policy,* at APP 0007. Provision A.1.e. describes "Personal Property of Others," thus satisfying the first requirement. Moreover, because the supplemental declaration page states a value of $500,000, the third requirement is also satisfied. *UNIC Policy,* at APP 0007. Accordingly, BMI's copper constitutes a covered property under provision A.1, subject to any limitation under provision A.2.

As noted, UNIC claims that the Exclusion (k) provision, which is listed under provision A.2, provides such a limitation insofar as it excludes the copper from the scope of the covered property under provision A.1. To repeat, the Exclusion (k) provision states: "Covered Property does not include: ... Property that is covered under another coverage form of this or any *other policy* in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance." *UNIC Policy,* at APP 0007 (emphasis added). Citing to the specific provisions in the Aon policy (a copy of which UNIC has introduced as part of its motion, Pl.'s Mot. for Summ. J., Ex. A–4 [hereinafter *Aon Policy* ]), UNIC argues that the Aon Policy is the "other policy" under the Exclusion (k) provision and that it more specifically describes the stolen copper.[8] Pl.'s Mot. for Summ. J. at 4–5, 8. Moreover, asserts UNIC, because the Aon policy has a limit of $25 million and the stolen copper was valued at $483,389.20, it is undisputed that the amount of loss does not exceed the limit of the Aon policy. *Id.* at 5. Accordingly, UNIC avers that UNIC is entitled to summary judgment declaring that there is no coverage for the thefts of the copper under its policy. *Id.* 5–6.

In their response to UNIC's motion, Defendants do not dispute that the Aon policy more specifically describes the stolen copper, nor do they dispute that there is no excess of the amount due from the

8. In support, UNIC points out that the Aon policy specifically insures commodities, including lead, zinc, and copper in "ingots, bars, cathodes, rods, *wirebars. billets or similar shape.*" Pl.'s Mot. for Summ. J. 5 (quoting *Aon Policy,* at APP 0068) (underline in original). That policy, maintains UNIC, further insures copper *"in bulk, or in bags, cases or drums." Id.* (quoting *Aon Policy,* at App. 0068) (underline in original). Moreover, the Aon Policy, UNIC continues, insures "storage risks" anywhere in the world, including

"[m]aterial stored in warehouse(s) by the Assured...." *Id.* (quoting *Aon Policy,* at APP 0069) (alteration in original). Further, UNIC points out that the rating schedule in the Aon Policy also includes a premium calculation for storage of *"lead, zinc, lead-metal and/or similar products"* for "[s]torage anywhere in the World at COMEX/LME warehouses" and for "[s]torage anywhere in the World at other warehouses." *Id.* (quoting *Aon Policy,* at APP 0076) (alteration and underline in original).

Aon policy.[9] They dispute, however, that the Aon policy is not an "other policy" (or "other insurance") within the meaning of the Exclusion (k) provision, and therefore, the provision is inapplicable.[10] BMI's Resp. 6–8; KDP's Br. 6; SMA's Resp. 4, 9; *see also* MTS's Resp. 3, 7–8; Def. MTS's Resp. to Proposed Undisputed Facts, Proposed Undisputed Facts, & Disputed Issues of Material Facts. 2 [hereinafter MTS's Resp. to Undisputed Facts], ECF No. 30. Accordingly, Defendants assert that the Exclusion (k) provision does not preclude the stolen copper from coverage under the UNIC policy. As this dispute—i.e., whether or not the Aon policy is an "other policy"—is material, the Court will address it below.

The Exclusion (k) provision as appears in the UNIC policy has been characterized as an excess "other insurance" clause—one of three most common types of "other insurance" clauses.[11] *Monumental Paving & Excavating, Inc. v. Penn. Mfrs.' Assoc. Ins. Co.*, 176 F.3d 794, 799–800 (4th Cir. 1999); *Nat'l Sur. Corp. v. Ranger Ins. Co.*, 260 F.3d 881, 885 (8th Cir.2001) (same). *See also Nat'l Fire Ins. Co. v. Travelers Indem. Co.*, 210 F.Supp.2d 479, 482

9. See also Defs.' Supplemental Br. 11, n. 4 ("BMI notes that for its part, it does not contend that the loss was not covered by the Aon Policy.").

10. The Court notes that in its response to UNIC's motion, MTS points out that there is a second disputed issue of material fact. It states, "MTS Disputes that UNIC's claimed exclusion k, overrides the specific coverage provided in the Declarations of the Policy." MTS's Resp. to Undisputed Facts 3. Pointing out that the declaration page states, "Stock, including the property of others, while in the insured's care, custody and control," MTS argues that the declaration language specifically intends to provide coverage for the property in this case, which is fully consistent with the desire of MTS to have coverage in the event of a casualty loss, such as a theft, so that its customer would be covered. Therefore, MTS maintains, the Exclusion (k) provision, if construed to exclude the copper from the policy's coverage, is in "conflict" with the declaration page. MTS's Resp. 8. That conflict, MTS's argues, renders the provision "ambiguous," and therefore the court should construe it in favor of coverage.

In essence, MTS asks the Court to read the declaration page in isolation from the rest of the provision of the policy. Quite the contrary, The Texas Supreme Court has held that in interpreting the terms of an insurance contract, courts "must read all parts of a contract together." *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex.1995). "Indeed, courts must be particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or section of a contract." *Id.* Consistent with that interpretive approach, the Court has, as discussed above, read the declaration pages in conjunction with provision A.1 of the "Building and Personal Property Coverage Form" to arrive at the conclusion that BMI's copper constitutes a covered property under the provision A.1, subject to any limitation under the provision A.2, of which the Exclusion (k) provision is a part. Thus, the declaration pages and provision A.1—read together—make a general statement of coverage, while the Exclusion (k) provision, if it is construed to apply here, acts as a more specific provision limiting that coverage. *See Forbau*, 876 S.W.2d at 133–34 ("[W]hen a contract provision makes a general statement of coverage, and another provision specifically states the time limit for such coverage, the more specific provision will control."). Accordingly, the Court finds no "conflict" between the declaration pages and the Exclusion (k) provision, and therefore no ambiguity on that ground.

11. There are three basic types of "other insurance" clauses: escape clauses, pro rata clauses, and excess clauses. Jeffery E. Thomas, 5 New Appleman on Insurance Law Library Edition § 41.02 (LexisNexis 2011). Excess clauses, in particular, provide that the insurer's liability shall be only the amount by which the loss exceeds the coverage of all other insurance, up to the limits of the excess policy. *In re Popkin & Stern*, 340 F.3d 709, 716 (8th Cir.2003); *U.S. Auto. Assoc. v. Underwriters at Interest*, No. 14–98–00234–CV, 2000 WL 332718, at *1 (Tex.App.-Houston [14th] Mar. 30, 2000, no pet.) (unpublished).

(S.D.N.Y.2002); *Utica Mut. Ins. Co. v. Travelers Ins. Co.*, 213 A.D.2d 983, 983, 624 N.Y.S.2d 485 (N.Y.App.Div.1995). "Other insurance" clauses are not uncommon in property insurance policies. The purpose of such clauses is to guard against moral hazards arising out of over-insurance—against temptations to the insured to defraud in order to profit from multiple recoveries under multiple concurrent policies for a total amount that exceeds the property's value,[12] *Dubuque Fire & Marine Ins. Co. v. Reynolds Co.*, 128 F.2d 665, 666 (5th Cir.1942), and against any carelessness on the insured's part in preserving the property, *Fed. Ins. Co. v. Hartford Steam Boiler Inspection & Ins. Co.*, 415 F.3d 487, 499 (6th Cir.2005). Designed to "protect the insurer from paying for multiple recoveries on the same claim," 44 Am.Jur.2d *Insurance* § 1264 (2003), the "other insurance" clauses vary, limit, or eliminate the insurer's liability where other insurance may cover the same loss. 15 Couch on Insurance § 219:1 (2009 & Supp. 2012). "Other insurance" clauses "are uniformly considered reasonable and valid, and are binding upon the parties to the contract." Jeffery E. Thomas, 5 New Ap-

pleman on Insurance Law Library Edition § 41.02 (LexisNexis 2011); *see also* 15 Couch on Insurance § 219:3 (Supp.2012) ("Other insurance clauses are valid in the absence of a statute or public policy to the contrary"); *Traders & Gen. Ins. Co. v. Hicks Rubber Co.*, 140 Tex. 586, 169 S.W.2d 142, 147 (1943) (stating in the context of liability insurance, "[w]e think the authorities uniformly hold that such an insurance contract [containing an "other insurance" clause], in the absence of any statute to the contrary, is valid.").[13]

■ In determining whether an "other insurance" clause applies, Texas courts apply the following test [hereinafter the "other insurance" test]: the other insurance must generally cover the same property and interest therein against the same risk in favor of the same party.[14] *State Farm Fire & Cas. Co. v. Griffin*, 888 S.W.2d 150, 155 (Tex.App.-Houston [1st Dist.] 1994, no writ) (citing *Am. Cent. Ins. Co. v. Harrison*, 205 S.W.2d 417, 420 (Tex.Civ.App.-Eastland 1947, writ ref'd n.r.e.)); *Members Ins. Co. v. English*, 706 S.W.2d 779, 784 (Tex.App.-San Antonio 1986, no writ) (same). The *Harrison* court appears to be the first Texas court to articulate the

**12.** "When a property owner obtains insurance policies from two or more insurers in a total amount that exceeds the property's value, the insured may have an inducement to destroy the property for the purposes of collecting the insurance." R. Keeton & A. Widiss, *Insurance Law: A Guide to Fundamental Principles, Legal Doctrines and Commercial Practices* § 3.11(a)(2) (1988).

**13.** *See also Dubuque Fire & Marine Ins. Co.*, 128 F.2d at 666 ("[T]he validity of the 'other insurance' provision of the Texas standard form policy is not questioned"); *AIU Ins. Co. v. Mallay Corp.*, 938 F.Supp. 407, 412 (S.D.Tex.1996) (noting that the Texas State Board of Insurance approved of the use of Insurance Service Organization ("ISO") form CP 00 10 10 91, a Building and Personal Property Coverage Form, which contains an identical Exclusion (k) provision as that ap-

pears in form CP 00 10 06 07 included in the UNIC's policy).

**14.** The test operates as a judicial interpretation of the term "other insurance"—a technical term of art frequently used in insurance policies—where, as here, the policy does not provide a contrary definition. *See* 46 C.J.S. *Insurance* § 1587 (2007) ("To constitute concurrent or other insurance ..., the policies must be on the same property or some part thereof, on the same interest, in the property, against the same risks, and in favor of the same party, unless the policy otherwise provides."). Accordingly, the term "other insurance" is susceptible to only one reasonable interpretation—that which is given by Texas courts. Consequently, it cannot be said that the Exclusion (k) provision is ambiguous merely because of that term.

test.[15] *Harrison,* 205 S.W.2d at 420 ("To require apportionment of the loss, the other fire insurance must generally cover the same property and interest therein against the same risk in favor of the same party.") (citing 45 C.J.S. *Insurance* § 922, what now appears to be 46 C.J.S. *Insurance* § 1587 (2007)). While the courts in *Harrison, English,* and *Griffin* applied that test to a pro-rata "other insurance" clause, at least one Texas court applied that test to an excess "other insurance" clause. *Hartford Cas. Ins. Co. v. Exec. Risk Specialty Ins. Co.,* 2004 WL 2404382, at *2 (Tex. App.-Dallas 2004, pet. denied) (unpublished) (applying the test to determine the applicability of an excess "other insurance" clause in a liability insurance) (citing *Harrison,* 205 S.W.2d at 420, and *English,* 706 S.W.2d at 784).

However, with the exception of the cases cited in the last paragraph, the parties have not pointed to, and the Court has not found, any other Texas court decision that has applied the test. Thus, Texas case law provides little guidance on how to apply the test to the facts of the case *sub judice.* The Court notes however that other jurisdictions apply similarly-phrased[16] tests in ascertaining whether there exists an "other insurance," "double insurance," or concurrent insurance;[17] most often such tests are applied to determine whether an apportionment of loss between two or more insurers is warranted. Additionally, case law from Texas and other jurisdictions have analyzed, though without articulating a formal test, similar situations involving other, double, or concurrent policies. Accordingly, in applying the "other insurance" test here, the Court will draw from the wisdom of these courts that have either applied a similar test or analyzed a similar situation.

Turning to the parties' arguments, UNIC, applying the "other insurance" test, argues that the Aon policy is "other policy"[18] within the meaning of the term in

**15.** That court adopted the test from the Corpus Juris Secundum.

**16.** The Court's research reveals that the tests applied by other jurisdictions are phrased similarly with one key exception: while most jurisdictions use the phrase "the same party" (as in "in favor of the same party"), others employ the following variants: "for the benefit of the same person"; "either in the name or for the benefit of the same person"; "payable to the same parties"; and "in favor the same insured." *E.g. Ins. Co. of N.A. v. Nicholas,* 259 Ark. 390, 533 S.W.2d 204, 206 (1976) ("[D]ouble insurance exists when the two policies cover the same interests in the same property, against the same risks, and for the benefit of the same person." (citation omitted)); *Wyman v. Allstate Ins. Co.,* 29 A.D.2d 319, 324, 288 N.Y.S.2d 250 (N.Y.App. Div.1968) ("The term 'other insurance', in the special sense in which it is often used in insurance contracts, describes that condition where two or more policies of insurance are effected upon or cover the same interest in the same, or part of the same, property, against the same risk, and either in the name or for the benefit of the same person." (inter-

nal quotation marks and citation omitted)); *Reliance Ins. Co. v. Liberty Mut. Fire Ins. Co.,* 13 F.3d 982, 983 (6th Cir.1994) (applying Michigan law) (" 'double coverage,' . . . only exists where 'both policies were on the same property, on the same interest in the property, against the same risks, and payable to the same parties.' ") (quoting *Lubetsky v. Standard Fire Ins. Co.,* 217 Mich. 654, 187 N.W. 260, 261 (1922)); *Ohio Cas. Ins. Co. v. State Farm Fire & Cas. Co.,* 262 Va. 238, 546 S.E.2d 421, 423 (2001) ("[T]hat the policies insure the same property is not sufficient to establish a common obligation; the policies in question must afford coverage for the same insureds, and the same risk.").

**17.** "In insurance contracts, the terms 'additional insurance,' 'other insurance,' and 'double insurance' are used interchangeably although there is a technical difference in their meaning." 44 Am.Jur.2d, Insurance § 1271 (Westlaw through Nov. 2012).

**18.** Throughout this opinion, the Court uses the term "other policy" and "other insurance" interchangeably.

the Exclusion (k) clause, because "both Policies insure the same property (the copper) and interest (of BMI) against the same risk (theft) in favor 'of the same party (BMI)." Pl.'s Reply to BMI & MTS 8. On the other hand, Defendants argue that because MTS is neither an insured nor a beneficiary in the Aon policy, the two policies are not in favor of the same party. BMI's Resp. 5–6; KDP's Br. 6; SMA's Resp. 4, 9. Moreover, they maintain that while the UNIC policy covers MTS's interest in the copper, the Aon policy does not. Defs.' Supplemental Br. 5–7. Therefore, Defendants' argument goes, the two policies do not cover the same interest. The parties however do not dispute that the two policies cover the same property i.e., BMI's copper, against the same risk, i.e., theft. Nor do they dispute that the Aon policy covers BMI's interest in its favor.

 The crux of the parties' dispute centers on the question of whose interests and what interests are covered in the UNIC policy. It is of course axiomatic that "[t]he thing insured is not the property described, but the interest or estate of the insured therein." *Smith v. N. Ins. Co. of NY*, 232 A.D. 354, 357, 250 N.Y.S. 30 (N.Y.App.Div.1931). And there may be "as many several insurances upon the same property as there are separate interests." *De Witt v. Agric. Ins. Co.*, 157 N.Y. 353, 51 N.E. 977, 978 (1898). The inquiry into what interests and whose interests are covered in a particular policy must necessarily be guided in the first instance by the language of the policy. *Cumis Ins. Soc'y, Inc. v. Republic Nat. Bank of Dall.*, 480 S.W.2d 762, 766 (Tex.Civ.App.-Dallas 1972, writ ref'd n.r.e.). Moreover, where, as here, the policy provides coverage for the personal property of others, that inquiry must further be informed by the relationship the premium paying insured has with the property and its owner.

Here, the supplemental declaration page of the UNIC policy describes MTS as a warehouseman. *UNIC Policy*, at APP 0006 ("Lumber Industry Warehouse"); *see also* MTS's Resp. to Undisputed Facts, Ex. A (Declaration of Brian Mundell), at 1. It is undisputed that the stolen copper was stored at MTS's warehouse pursuant to a warehousing contract, and at the time of thefts, the copper was in care, custody, and control of MTS. Consequently, as the parties agree, a bailment existed between BMI (depositor-bailor) and MTS (warehouseman-bailee). *See Thornton v. Daniel*, 185 S.W. 585, 589 (Tex.Civ.App.-El Paso 1916, no writ) ("[The defendant] having received the goods under a contract to store them in his own warehouse, and having actually stored them in his own warehouse under said agreement, was a depositary bailee."); 73 Tex. Jur.3d *Warehouses* § 3 (2012) ("When goods are stored with a warehouse, the relationship of bailor and bailee is created between the depositor or owner and the warehouse operator.").

 A bailment relationship gives rise to a distinct type of interests in the bailed goods. Under Texas law, a bailee is authorized to insure the bailed goods in its custody for its full value for the benefit of itself and the bailor. *Am. Cent. Ins. Co. v. Crespi & Co.*, 218 S.W.2d 269, 271 (Tex. Civ.App.-Austin 1949, no writ); *Anchor Cas. Co. v. Robertson Transp. Co.*, 389 S.W.2d 135, 138 (Tex.Civ.App.-Corpus Christi 1965, writ ref'd n.r.e.); *Cumis Ins. Soc'y, Inc.*, 480 S.W.2d at 765. Thus, if such a bailee insures goods in its own name, it may, in case of loss, recover their entire value, holding the excess over its own interest in them for the benefit of the bailor. *S. Cold Storage & Produce Co. v. A.F. Dechman & Co.*, 73 S.W. 545, 546 (Tex.Civ.App.-San Antonio 1903, no writ) (citing, among other cases, *Cal. Ins. Co. v. Union Compress Co.*, 133 U.S. 387, 409, 10

S.Ct. 365, 33 L.Ed. 730 (1890)). The case law often characterizes a bailee's interest in the bailed goods as a "special" or "limited" interest. *Id.; Home Ins. Co. v. Baltimore Warehouse Co.*, 93 U.S. 527, 541, 23 L.Ed. 868 (1876). A bailee, if it wishes, may also insure only its limited interest in the bailed goods by employing express language in the contract of insurance to that effect. *Cumis Ins. Soc'y, Inc.*, 480 S.W.2d at 764; *see also Home Ins. Co. v. Gwathmey*, 82 Va. 923, 1 S.E. 209, 211–213 (1887) (interpreting a warehouseman's policy that states "[the insurer] hereby agree[s] to make good unto the said assured . . . , *all such immediate loss or damage, not exceeding in amount the sum or sums insured as above specified, nor the interest of the assured in the property* " to hold that the policy covered only the warehouseman's interest in the stored goods, not any of its depositors (emphasis in original)).[19] Thus, where a bailee effects a property insurance policy covering the bailed goods itself, the bailee is presumed—absent policy language to the contrary—to have insured, up to the full value of the goods, not exceeding the sum insured, its interest as well as that of the bailor in the goods.[20]

Here, the UNIC policy insures the property itself—i.e., the personal property of others that is stock and is in care, custody, and control of MTS. So, the obvious question is whether the above-mentioned presumption holds. Thus, in the above, the Court has phrased the inquiry as: whose interests and what interests are covered in the UNIC policy. In responding to that inquiry, Defendants first posit that the relevant interest for purposes of the "same interest" analysis under the "other insurance" test is "insurable interest." They then articulate two such interests of MTS that they claim are covered under the UNIC policy. First, they submit that MTS has an insurable interest in the copper to the extent that it derived pecuniary benefit or advantage by the preservation and continued existence of the property, and further that it sustained pecuniary loss from the copper's destruction. Defs.' Supplemental Br. 5 (citing *Smith v. Eagle Star Ins. Co.*, 370 S.W.2d 448, 450 (Tex. 1963)). Defendants explain that MTS makes more money the longer any bailed property is stored at its warehouse, but if the bailed property is stolen, it cannot collect its bailment fees for that property. *Id.* MTS sustained pecuniary loss from the thefts, Defendants continue, because it no longer made money off the bailment of the copper, and lost its customer and damaged its goodwill. *Id.* Second, Defendants maintain that MTS's had an insurable interest as the bailee of the copper. *Id.* As a bailee, Defendants maintain, MTS had a duty to account and return the copper to BMI and thus insured its interest in the copper so that in the event of a loss, it could account to and return the copper (or its proceeds) to BMI. *Id.* Because the Aon policy does not cover these interests of MTS, Defendants argue, the two policies do not cover the same interest. UNIC, on

---

19. *Cf. Baltimore Warehouse Co.*, 93 U.S. at 542 ("If, as they claim, only the interest which the warehouse company had in the merchandise deposited in their warehouse was intended to be insured, why was that interest described as the merchandise itself? *Why not as the assured's interest in it?* " (emphasis added)).

20. *See Cumis Ins. Soc'y, Inc.*, 480 S.W.2d at 764–65 (noting other courts have held that a property insurance policy to indemnify an insured bailee for the loss of the bailed goods covers not only the bailee's interest in the goods but also provides "broader coverage" for the full value of the goods (emphasis added)); *see also Baltimore Warehouse Co.*, 93 U.S. at 545 (holding the policy issued to the warehouse company "covered the merchandise held by the . . . company on storage, and *not merely* the interest of the bailees in that property." (emphasis added)).

the other hand, submits that the term "interest" in the "other insurance" test means "right[,] title[,] or legal share" in the property covered under the policy, not any "insurable interest" broadly. Pl.'s Supplemental Br. 3, 10–11 (citing dictionary).

 Defendants' first articulation of MTS's interest rests on Texas courts' broad definition of "insurable interest,"[21] under which, an insurable interest in property does not dependent upon an absolute right to ownership of, or a lien upon property, and neither legal nor equitable title is necessary. *Smith*, 370 S.W.2d at 450; *Valdez v. Colonial Cnty. Mut. Ins. Co.*, 994 S.W.2d 910, 914 (Tex.App.-Austin 1999, pet. denied) (citation omitted). Defendant's second articulation of MTS's interest is based on a bailee's duty to account to a bailor,[22]—i.e., a bailee's responsibility to safely preserve and deliver the bailed goods—which arises from the bailment relationship. It is precisely because of this duty that the case law recognizes that a bailee has an insurable interest in the bailed goods—to the extent that it may effect an insurance on the goods both in its and the bailor's favor—even when it does not have any direct pecuniary interest in the goods. *Cumis Ins. Soc'y, Inc.*, 480 S.W.2d at 766; *Fire Ins. Ass'n, Ltd. v. Merchants' & Miners' Transp. Co.*, 66 Md. 339, 7 A. 905, 907–08 (1887); *cf. Hartford Fire Ins. Co. v. Producer's Gin of Hernando, Inc.*, 326 So.2d 807, 809 (Miss.1976) ("[W]hen one has the custody, care or possession of property for another as bailee, he may, although he has no pecuniary interest therein and is not responsible for its safe keeping, insure[ ] it in his own name for the benefit of the owners, and recover the whole loss.").

However, the doctrine of "insurable interest," the purpose of which is to discourage the use of insurance for illegitimate purposes, such as wagering, *Valdez v. Colonial Cnty. Mut. Ins. Co.*, 994 S.W.2d 910, 914 (Tex.App.-Austin 1999, pet. denied); *Pacific Fire Ins. Co. v. John E. Morris Co.*, 12 S.W.2d 971, 971 (Tex. Comm'n App.1929), generally applies to the issue of validity or enforceability of an insurance contract, *Stillwagoner v. Travelers Ins. Co.*, 979 S.W.2d 354, 360 (Tex.App.-Tyler 1998, no pet.) (explaining that an insured must have an insurable interest, otherwise a property insurance policy is invalid); *United Techs. Corp. v. Am. Home Assurance Co.*, 989 F.Supp. 128, 143 (D.Conn. 1997) ("The 'insurable interest' analysis involves whether the insurance policy is unenforceable or void because it fails to protect any interest of the insured." (citation omitted)). The requirement that an insured must have an insurable interest for

---

21. An insurable interest exists when the insured "derives pecuniary benefit or advantage by the preservation and continued existence of the property or would sustain pecuniary loss from its destruction." *Smith*, 370 S.W.2d at 450.

22. The District Court for the Northern District of Texas has explained a bailee's responsibility pursuant to its duty to account in the context of a property in the following way:

The gin company under its caretaker duty as bailee for hire certainly was responsible for the cotton seed [bailed goods] and obligated to keep and deliver same safely, subject to exoneration only if performance be prevented without negligence on its part. That was a present and positive liability, and in fact no other liability ever supervened.

*United States v. Globe & Rutgers Fire Ins. Co.*, 104 F.Supp. 632, 634 (N.D.Tex.1952), *aff'd* 202 F.2d 696 (5th Cir.1953). Consequently, in the context of property insurance, any liability of a bailee for its failure to account refers to the "present and existing liability" of the custodian generally and not to liability which is the consequence of a fire or, as here, a theft. *Globe & Rutgers Fire Ins. Co. v. United States*, 202 F.2d 696, 697 (5th Cir. 1953).

the policy to be valid is easily satisfied because courts define "insurable interest" broadly, *Schubert v. Auto Owners Ins. Co.,* 649 F.3d 817, 826–27 (8th Cir.2011), and make every effort to find an insurable interest to sustain coverage. 44 C.J.S. *Insurance* § 318 (2007). In the case *sub judice,* however, the Court is not tasked to determine whether the UNIC policy is invalid or unenforceable for want of an insurable interest.[23]

The Court is not persuaded by Defendants' attempt to shoehorn an interest based upon the broad definition of "insurable interest," into the analysis of the "same interest" prong. The difficulty with Defendants' argument is that in nearly every case involving a for-profit ware-houseman, those same interests, as articulated by Defendants, can be asserted to defeat the "other insurance" test. Such a broad view of the interests would render the test meaningless. Moreover, the cases that have applied the "other insurance" or a similar test have taken a much narrower view of the interest for purposes of determining whether two policies cover the same or distinct interests: they have considered interests based on property rights (ownership) or contract rights (such as a lien on the property).[24] Defendants have not cited, and the Court has not found, any case in which a court has relied solely upon the types of interest articulated by Defendants, i.e., the more generalized, broader insurable interests, to hold that "same interest" is lacking.[25]

**23.** UNIC, who, as the insurer, is the only party that can contest the existence of an insurable interest, *Commonwealth Ins. Co. of N.Y. v. Lacy,* 214 S.W.2d 899, 901 (Tex.Civ. App.-Texarkana 1948, writ ref'd n.r.e.) ("[I]nsurer is the only party that can take advantage of a want of insurable interest; it is a defense that is available to an insurer in proper cases"), concedes that MTS had an insurable interest in that property as a bailee. Pl.'s Supplemental Br. 10–11.

**24.** *E.g., Harrison, supra,* 205 S.W.2d 417, 418 (two brothers' unique but undivided interests in a partnership); *Mut. Benefit Ins. Co. v. Goschenhoppen Mut. Ins. Co.,* 392 Pa.Super. 363, 572 A.2d 1275, 1277–78 (1990) (vendor's interest of legal ownership versus vendee's interest of equitable ownership in the home); *St. Paul Fire & Marine Ins. Co. v. Protection Mutual Ins. Co.,* 607 F.Supp. 388, 391 (S.D.N.Y.1985) (landlord's fee interest in a building versus commercial tenant's leasehold interest in the same building); *Mercantile Credit Corp. v. Glens Falls Ins. Co.,* 22 A.D.2d 1009, 1009, 254 N.Y.S.2d 614 (N.Y.App.Div. 1964) (owners' fee interest in equipment and livestock versus creditor's security interest in a chattel mortgage on the same property); *Newark Fire Ins. Co. v. Turk,* 6 F.2d 533, 535 (3d Cir.1925) (grantee's ownership interest in the real property versus mortgagee's interests in debt secured by the same property). *Peerless Ins. Co. v. Bailey Mortgage Co.,* 345 F.2d 14, 18 (5th Cir.1965) (homebuyers' equitable interest arising from contract for purchase of the house versus mortgagee's interest in the home arising from its extension of a loan for the construction of the home).

**25.** Defendants directs the Court's attention to the following language in *English,* where after finding that the two policies at issue were not "other insurance" as to each other, the court stated: "[t]he evils which 'other insurance' clauses are designed to prevent are not present where each policy insures only the interest held by each separate owner of an *insurable interest* in the property." *English, supra,* 706 S.W.2d 779, 784 (emphasis added). Relying on this language, Defendants appear to argue that an insurable interest of any type—however broad—would suffice for purposes of the "same interest" analysis. In *English,* the plaintiffs entered into a contract with a homebuilder to construct a house on their land. The plaintiffs purchased a homeowner's policy, which contained a pro-rata "other insurance" clause, and the homebuilder purchased a builder's risk policy "covering his interest in the same house." *English,* 706 S.W.2d at 781. The court found the plaintiffs' policy insured "only their own interest in the property" and builder's risk policy "insured only the interest of [the homebuilder]." *Id.* at 783. The Court held the policies insured distinct interests. *See id.* at 784.

The *English*-court however did not elaborate on the nature of the interests, nor does

To be sure, a warehouseman does have one readily cognizable contract-right based interest in the stored goods: a warehouse bailment, which is a creature of contract such as a warehouse receipt or storage agreement, gives rise to a lien in favor of the warehouseman on the stored goods for rent, expenses, advances, commissions, and other similar charges.[26] That interest is presumed to be covered by the warehouseman's policy insuring the stored goods itself, unless the policy speaks to the contrary. *Baltimore Warehouse Co.*, 93 U.S. at 542–44; *S. Cold Storage & Produce Co.*, 73 S.W. at 546; *Pittsburgh Storage Co. v. Scottish Union & Nat'l Ins. Co.*, 168 Pa. 522, 32 A. 58, 59 (1895). Even then, courts find that the warehouseman's policy and the depositor's policy on the same goods are other, double, and concurrent policies. *E.g.*, *Baltimore Warehouse Co.*, 93 U.S. at 543, 545–46 (noting that the warehouse company's policy covered the entire interest in the stored merchandise, not merely the company's interest in liens upon the merchandise for "charges, expenses, advances, and commissions," and concluding that the warehouse company's policy and

the opinion contain any language of the policies which may indicate what interests they covered. In a different section of the opinion, the court noted that the plaintiffs had an insurable interest in the house under construction to the extent that they "obtained a loan commitment on the property, had taken possession and had made improvements representing an expenditure in excess of $2,000.00 for materials and more than 300 hours of labor." *Id.* at 784. That is to say, the plaintiffs' homeowner's policy covered their ownership interest in the house. As to the builder's interest, nothing further is said in the opinion. However, to the extent that the opinion refers to "builder's risk" policy, it might be surmised that the interest covered was the *quasi* "ownership" interest of the builder in the house to the extent of his expenditure for materials used and labor performed in its construction. *See* 1 Couch on Insurance § 1:53 ("A builder's risk policy ordinarily indemnifies a builder or contractor against the loss of, or damage to, a building he or she is currently in the process of constructing."). That interest was further secured by a builder's and mechanic's lien the plaintiffs executed in favor of the builder.

To be sure, in applying the "other insurance" tests, courts often use the terms "interest" and "insurable interest" interchangeably, even though their ultimate determination of the interest rests on property or contractual rights. *See, e.g.*, *Loftis v. Stuyvesant Ins. Co.*, 54 Tenn.App. 371, 390 S.W.2d 722, 725–26, 728–29 (1965) (concluding the interests of the mortgagor (owner), the mortgagee, the vendor (owner), and the vendee in a house covered by two policies at issue are distinct, while at times referring to these interests as insurable interests). Such use of the terms is unsurprising, because an interest based on property or contract rights constitutes a much narrower form of the "insurable interest." *See* 44 C.J.S. *Insurance* § 319 (2007) ("An insurable interest ... may be based upon (1) the factual expectation of damages; (2) property interests; (3) legal liability; or (4) a contract right."). The language in *English* relied on by Defendants can be understood to exemplify such a use of the terms.

26. Under Texas law, warehouse's statutory lien automatically attaches to the stored goods on the account of such charges, without any express notation on the receipt or storage agreement. Section 7.209 of the Texas Business and Commerce Code provides:

a) A warehouse has a lien against the bailor on the goods covered by a warehouse receipt or storage agreement or on the proceeds thereof in its possession for charges for storage or transportation, including demurrage and terminal charges, insurance, labor, or other charges, present or future, in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law.

. . .

(b) The warehouse may also reserve a security interest under Chapter 9 against the bailor for the maximum amount specified on the receipt for charges other than those specified in Subsection (a), such as for money advanced and interest. A security interest is governed by Chapter 9.

Tex. Bus. & Com.Code Ann. § 7.209.

the depositors' policy were double insurance); *see also Fire Ins. Ass'n, Ltd.,* 7 A. at 909–10. (holding a common carrier's policy that covered cotton in its charge or custody as well as "the amount of earned freight and charges, if any, thereon" and the policy of the owner of the cotton contributing).

As these cases reflect, for purposes of determining whether a warehouseman's policy insuring the stored goods itself and its depositor's policy on the same goods are other, double, or concurrent policies, courts treat the warehouseman's policy as covering *only* the depositor's interest, even though the policy may also cover the warehouseman's lien interest. This treatment is consistent with Texas cases suggesting that two policies need not be completely coextensive in all respects to render them other, double, or concurrent policies. *See Harrison,* 205 S.W.2d at 420 (finding two policies not concurrent or "other" policies as to each other, noting that *"although to some extent* [the two policies] covered the same property, did not cover the same interest and, o[f] course, were not in favor of the same party." (emphasis added)); *Liverpool & London & Globe Ins. Co. v. Delta Cnty. Farmers' Assn.,* 56 Tex.Civ. App. 588, 121 S.W. 599, 601 (1909, writ ref'd) ("[W]herever there are two separate insurers liable for the same loss the fact that one policy covers more property or wider risks than the other does not prevent the insurance being double on the subjects covered by both."). *See also Nutmeg Ins. Co. v. Emp'rs Ins. Co.,* No. 3;04–CV–1762B, 2006 WL 453235, at *12 (N.D.Tex. Feb. 24, 2006) (stating two liability policies' "coverage need not be completely coextensive for them to be considered 'other insurance' as to each other" (citing *Harrison,* 205 S.W.2d 417, 420)).

Be that as it may, UNIC contends that its policy does not cover any interest of MTS, let alone MTS's lien interest in the copper. Pl.'s Supplemental Br. 11. In support, UNIC points to provision A.1.c in the "Building and Personal Property Coverage Form," which states: "[O]ur payment for loss of or damage to personal property of others will *only* be *for the account of* the owner of the property." *UNIC Policy,* at APP 0008 (emphasis). Relying on this provision, UNIC argues that the policy covers only the interest of BMI—as the owner of the copper. Pl.'s Supplemental Br. 9. UNIC's argument has traction. The plain meaning of the phrase "for the account of" suggests that the policy covers the personal property of others on behalf of, or for the benefit of, the owners of the property. *See* Webster's Third New International Dictionary Unabridged 474 (1993) (defining "for account of" as "on behalf of"). Moreover, courts have construed an identical provision to infer that the parties to the contract intended that the policy is for the benefit of the owner of the property, i.e., that the owner is a third-party beneficiary. *Peters v. Emp'rs Mut. Cas. Co.,* 853 S.W.2d 300, 301 (Mo.1993); *Sentience Studio, LLC v. Travelers Ins. Co.,* 102 Fed.Appx. 77, 80 (9th Cir.2004) (unpublished) (*per curiam* ); *see also Lanese v. Mecca,* No. 0116816, 1995 WL 811534, at *2 (Conn.Super.Ct. Dec. 22, 1995) (construing an identical provision to state that "it was the intention of the parties that the policy create a direct obligation to the owner of the personal property, to the extent of making payment directly to the owner"). This interpretation of the provision is also consistent with the policy's description of insured property as "in the insured's care, custody, and control," which signifies that the policy is made for the benefit of the owner of the property. *See Orient Ins. Co. v. Skellet Co.,* 28 F.2d 968, 970 (8th Cir.1928) (stating had the policy recited "that the goods described were held in trust, or a similar expression of like import [as in this case,

'in care, custody, and control']," "then there could be no doubt that the contract was made in the name of Skellet Co. [the warehouse] for the benefit of the real owners.").

Moreover, because the UNIC policy is for the benefit of the owner of the property, it follows that the policy covers the interest of the owner.[27] What is more, provision A.1.c. also states "only" for the account of the owner of the personal property. Thus, the parties to the contract clearly intended that the policy is for the *sole* benefit and interest of the owner—not of the insured. *See Bitter v. Associated Indem. Corp.,* 612 S.W.2d 715, 717 (Tex. Civ.App.-Corpus Christi 1981, no writ) (interpreting a similar provision in a liability insurance policy, to wit, "Loss, if any, at the option of this Company [insurer], to be adjusted with and paid to the Insured for the account of whom it may concern, or adjusted with and paid direct to the owners of such lost or damaged property" to mean that the policy "does not contemplate a payment to the Insured for his own benefit"). Thus understood, the provision suggests that the policy does not cover MTS's interest, be it lien interest or otherwise, in the copper. *Cf. First Nat'l Bank of Waxahachie v. Lancashire Ins. Co.,* 62 Tex. 461, 465 (Tex.1884) (finding in that case that the interest of the insured in an open policy was not covered, stating "[w]e may admit that the plaintiff [insured] had an insurable interest in the property, . . . but it was not such an interest as was protected by this policy.").

*Dixey v. Fed. Compress & Warehouse,* 140 F.2d 820 (8th Cir.1944), is further instructive. There, the plaintiffs stored their cotton in the defendant's warehouse under warehouse receipts issued in accordance with the United States Warehouse Act.[28] The regulations promulgated under the Act required warehousemen to insure stored cotton against fire,[29] and in the event of casualty, to promptly take steps to collect the proceeds on the policy and pay over to its depositors. The defendant took out insurance on the cotton. The plaintiffs also bought an insurance policy covering their cotton, which contained an "other insurance"-like clause that required pro-rata contribution from other insurance. At issue was whether the two policies constituted double or concurrent insurance, requiring apportionment of loss between the insurers of the two policies. The court held they were. In reaching that conclusion, the Court stated: "Although the [plaintiff-depositors' insurer] promised to

---

27. This is so because for purposes of the "other insurance" test, in determining whether a policy covers the interest of a party, not named as an insured, courts frequently inquire whether the policy is made for the benefit of that party, suggesting that if the latter condition is met, then the policy covers that party's interest. *See, e.g., English,* 706 S.W.2d at 783 ("Since the plaintiffs purchased their policy . . . in their own names without any stipulation or understanding that such insurance was for the benefit of Schweers, it will be presumed that they insured only their own interest in the property."); *Harrison,* 205 S.W.2d at 418 ("A partner who insures partnership property in his own name without any stipulation or understanding that the insurance is for the benefit of the firm or his co-partner, is presumed to

have insured only his own interest in the property.").

28. Some of the facts of the case appear in an earlier opinion in the same case, *Dixey v. Fed. Compress & Warehouse,* 132 F.2d 275 (8th Cir.1942) [hereinafter *Dixey I*].

29. That the regulations required warehousemen to insure stored cotton of its depositors was not material to the court's holding, as the court stated: "When, pursuant to this regulation which has the force and effect of law, defendant took out the insurance, it may well have been primary insurance, but when it became effective it did not differ in its contractual obligations from any other insurance." *Dixey I,* 132 F.2d 275, 279.

pay to the plaintiffs and the [defendant-warehouse company's insurer] promised to pay to the warehouse company, the warehouse company was required by the regulation to pass the money promptly on to the plaintiffs so that the plaintiffs' interest was *the sole and real interest insured.*" *Dixey,* 140 F.2d at 822 (emphasis added).

Here, the UNIC policy's language providing that the payment for loss will be made solely for the benefit of MTS's depositors operates to the same effect as did the regulations in *Dixey.* Although other provisions of the UNIC policy leave it to UNIC's discretion whether to pay any payable proceeds directly to the owner of the personal property of others or to MTS for the account of such an owner,[30] BMI would, as UNIC concedes, be entitled to such proceeds under the UNIC policy.[31] *See Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.,* 348 S.W.3d 894, 900 (Tex.2011) ("A third party may recover on a contract made between other parties only if the parties intended to secure some benefit to that third party, and only if the contracting parties entered into the contract directly for the third party's benefit."). Consequently, BMI's interest was the *sole and real interest* insured under the UNIC policy.

The Court therefore concludes that the UNIC policy and the Aon policy cover the same property (the copper) and same interest (BMI's) therein against the same risk (theft) in favor of the same party (BMI), and as such, the Aon policy is the "other policy" within the meaning of the

Exclusion (k) provision. Moreover, because it is undisputed that the Aon policy more specifically describes the stolen copper and that there is no excess amount due from the Aon policy, the Court finds that there is no genuine dispute as to the material fact that the Exclusion (k) provision precludes coverage for the thefts of the copper under the UNIC policy. The Court holds that UNIC is entitled to summary judgment on this account.[32]

Finally, because the Court has ruled in favor of UNIC on its claim that the Exclusion (k) provision precludes coverage of the thefts under its policy, the Court does not reach UNIC's alternative claim that provision G.2 of "Commercial Property Conditions" precludes coverage for the thefts. Further, it appearing that the Court's ruling on this motion addresses all of the relief sought by the parties, the Court will close this case.

## IV. CONCLUSION

For the foregoing reasons, the Court enters the following orders.

**IT IS HEREBY ORDERED** that Plaintiff United National Insurance Company's Motion for Summary Judgment (ECF No. 28) is **GRANTED. IT IS FURTHER ORDERED** and **DECLARED** that:

(1) Under United National Insurance Company Policy No. KPM0000170, Plaintiff has no duty to defend or indemnify—as those duties are understood in the context of a liability insurance—De-

---

**30.** UNIC Policy, at APP 0016 (provisions D.4.d-e in the Building and Personal Property Coverage Form).

**31.** MTS's Resp., Ex. B (MTS's Am. Resp. & Objections to Def. MTS's First Request for Admission to Pl.), at MTSAPP 0008 ("UNIC admits that if the stolen copper was not insured by and more specifically described in another policy, or if UNIC provided primary

coverage for the stolen copper owned by Bal Metals, which it does not, as the owner of the property Bal Metals would be entitled to any payment made under the Policy regarding the theft losses in question.").

**32.** The Court has carefully considered the parties' other arguments and finds that those arguments do not alter this holding.

fendant Mundell Terminal Services, Inc. in the lawsuit styled *BAL Metals International, Incorporated v. Mundell Terminal Services, Inc.*, Cause No.2011–663, which was filed in the 41st Judicial District Court, El Paso County, Texas.

(2) No coverage exists under Policy No. KPM0000170 for the thefts of Defendant BAL Metals International Incorporated's copper occasioned on or about November 25, 2010, and December 4, 2010, at Defendant Mundell Terminal Services, Inc.'s warehouse located at 9650 Railroad, El Paso, Texas.

Pursuant to Federal Rule of Civil Procedure 58, a separate judgment will be entered in accordance with this Memorandum Opinion and Order.

**IT IS FURTHER ORDERED THAT** all pending motions, if any, are **DENIED as moot,** and that the Clerk **SHALL CLOSE** the case following entry of the Final Judgment.